# STATE OF MICHIGAN

# COURT OF APPEALS

MATTHEW WILLIAMS,

Plaintiff-Appellee,

v

PAUL SHAPIRO, M.D. and MICHIGAN
ORTHOPAEDIC INSTITUTE, P.C.,

Defendants-Appellants.

UNPUBLISHED
August 9, 2018

No.   332909
Oakland Circuit Court
LC No.   2014-141853-NH

Before:  RIORDAN, P.J., and K. F. KELLY and BOONSTRA, JJ.

PER CURIAM.

This interlocutory appeal in a medical malpractice action has been remanded by the Michigan Supreme Court for consideration as on leave granted.[1]  Defendants[2] appeal the trial court's order denying their motion for summary disposition under MCR 2.116(C)(10).  We reverse and remand for entry of an order granting summary disposition in favor of defendants.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff has a history of pain in his right shoulder and had been diagnosed with tendonitis and degenerative osteoarthritis in that area since at least 2011.  Plaintiff had arthroscopic surgery on his right shoulder in 2011; the surgeon noted a partial biceps tendon tear, "osteoarthritic changes of the glenoid," a "partial undersurface tear" of the rotator cuff, "degenerative tearing of the anterior glenoid labrum," and "calcinosis changes within the glenohumeral joint itself."  In June 2012, plaintiff made an initial visit to Michigan Orthopaedic, complaining of intermittent

---

[1] This Court denied defendants' application for leave to appeal.  *Williams v Shapiro*, unpublished order of the Court of Appeals, issued October 26, 2016 (Docket No. 332909).  Our Supreme Court, in lieu of granting leave to appeal, remanded this case to this Court for consideration as on leave granted.  *Williams v Shapiro*, 500 Mich 980; 893 NW2d 631 (2017).

[2] Plaintiff's claims against defendant Michigan Orthopaedic Institute, P.C. are derivative of his claims against defendant Paul Shapiro, M.D.  For convenience, our use of "defendant" in the singular will refer to Dr. Shapiro.

right shoulder pain; plaintiff was examined by Dr. Peter Donaldson, who diagnosed him with "right-sided glenohumeral osteoarthritis and possible recurrent cuff tearing." Dr. Donaldson concluded that "the only thing that would truly address his pain would be shoulder arthroplasty," i.e., shoulder replacement surgery, and referred plaintiff to defendant. After reviewing imaging studies of the right shoulder and considering the fact that plaintiff had ongoing pain, defendant concurred with Dr. Donaldson's diagnosis of glenohumeral osteoarthritis in the right shoulder. Defendant recommended that plaintiff have a "glenoid resurfacing hemiarthroplasty," a surgical procedure that would involve the insertion of a medical device in the shoulder joint.

Defendant performed the surgery on July 16, 2012. At the first follow-up appointment with defendant three days later, plaintiff stated that "on Monday night[3] he fell after taking a pain pill and sustained a direct blow to his head." Defendant's physical examination of plaintiff revealed "erythema[4] and mild warmth in an area medial to the elbow" that was "tender to palpation as well." Defendant observed that "there was some swelling at the arm as well." Nonetheless defendant also noted that, based on radiography and physical examination, plaintiff's shoulder implant was in an "excellent position." Defendant recommended that plaintiff immediately go to an emergency room for "workup of blood clot in the right arm" and prescribed plaintiff oral antibiotics. Defendant's notes from that visit also state:

> If the blood clot workup is negative, he will likely be sent home and I have asked him to keep an eye on the redness and swelling in his right arm. If it worsens over the subsequent couple of days, he is to present again to Beaumont Emergency Room for possible IV antibiotics. He understands and agrees with this plan.

Plaintiff went to the emergency room that day. According to the emergency room physician's notes, plaintiff's surgical wound appeared to be healing well, but there was "redness, warmth, and swelling distal to the surgical wound," and plaintiff had pain in his right forearm radiating to his hand and also tingling in his right hand. The physician instructed plaintiff to continue taking the previously prescribed oral antibiotic.

Plaintiff returned to the emergency room the following day, complaining of a swelling and a painful rash on his right arm; the emergency department notes from that visit stated the rash was a "new problem" although it was associated with "recent right shoulder surgery." Plaintiff was kept overnight and given intravenous (IV) antibiotics; no blood clot was found.

Plaintiff returned to defendant's office for a follow-up visit on July 26, 2012. Defendant's notes indicate that plaintiff was then taking oral antibiotics and had been given IV antibiotics at the hospital. Defendant observed that plaintiff's "questionable cellulitic area," had resolved but that "now he has an area of swelling in the anterior aspect of his shoulder.

---

[3] Plaintiff's surgery was performed on an outpatient basis on a Monday.

[4] Erythema is redness of the skin. See https://www.medicinenet.com/script/main/art.asp?articlekey=3306 (last visited July 23, 2018).

[Plaintiff] states it has been there since the surgery, but this is the first that I have really seen that problem." Defendant noted swelling but "no erythema, warmth or discharge" to "suggest infection." Defendant drew some fluid from the swelled area and sent it to a laboratory "for white blood cell count." Defendant instructed plaintiff to continue his oral antibiotics and to return in one week.

Plaintiff returned to defendant's office five days later. Defendant's notes for that visit state that plaintiff contacted his office because he was "concerned about swelling again in his shoulder." Defendant's examination of plaintiff revealed "prominent swelling" near the incision but "no erythema, warmth or discharge." Defendant noted that the lab results of the fluid taken from plaintiff five days before were negative for infection. Defendant believed that plaintiff had a postoperative hematoma and recommended an "I&D" (incision and debridement) surgical procedure to alleviate this condition. Plaintiff agreed to this procedure, and "[i]ncision and redebridement of right shoulder wound with ligation of cephalic vein," as well "significant irrigation" done to "washout any potential infectious areas" was performed the next day. Defendant's surgical report indicates that there was "evidence of possible bleeding following the cephalic vein from a small branch" and that after ligating[5] the vein "there was no evidence of bleeding whatsoever." Defendant examined plaintiff the day after the surgery and found "swelling anteriorly consistent perhaps with a persistent hematoma," but no other issues. Defendant recommended daily dressing changes and another follow-up appointment in a week.

On August 3, 2012, plaintiff contacted defendant via text message and reported "pressure from the increased accumulation of blood" that had "stopped the stitches from healing" and that there was "lots of leakage." Defendant recommended that plaintiff go to the emergency room, and plaintiff did so.[6] Defendant performed a second I&D procedure on plaintiff on August 4, 2012 at Beaumont Hospital. Defendant's surgical report noted that plaintiff's shoulder appliance was "completely intact" but there were "some small bleeders down at the pectoralis major insertion where the release was done initially." Defendant believed the second procedure had restored "complete homeostasis."

Plaintiff again visited the emergency room on August 6, 2012 complaining of drainage from his shoulder incision; he denied being in significant pain. No signs of infection were noted by the emergency room physician.

Defendant saw plaintiff again on August 14, 2012. Defendant noted that plaintiff was "doing well" and that plaintiff's wound was intact with no sign of infection. Defendant recommended physical therapy and a follow-up appointment in 4 weeks. However, plaintiff had

---

[5] Ligation is "the surgical tying of veins through a small incision in the skin to prevent pooling of blood." See https://my.clevelandclinic.org/health/treatments/17614-venous-disease-vein-ligation--stripping (last visited July 19, 2018).

[6] The record does not contain an emergency department report for this visit, but defendant's surgical report for an August 4, 2012 procedure describes plaintiff as an "Emergency Patient" and lists his status as "Discharged."

a recurrence of draining from the wound and saw defendant again on August 23, 2012. Defendant noted no warmth or erythema. Defendant again prescribed plaintiff oral antibiotics and scheduled a one-week follow-up visit.

At an August 30, 2012 appointment, there was again no erythema or warmth, but there was evidence of purulence[7] coming from plaintiff's right shoulder wound, which indicated infection. Defendant recommended another drainage procedure, and said that plaintiff would likely need to be examined by an infectious disease specialist and receive IV antibiotics. The drainage procedure was done the next day, and following consultation with infectious disease specialist Dr. Shaun Healy, plaintiff was placed on IV antibiotics. Plaintiff denied being in pain on the day of the procedure and stated that "the pain has been well controlled."

Plaintiff began to receive daily IV antibiotics, but the drainage of the wound continued throughout September 2012. On September 25, 2012, plaintiff was admitted to the hospital with a right shoulder infection. The next day, defendant performed another I&D procedure and removed plaintiff's shoulder implant.

Over the next nine months, plaintiff underwent multiple surgical procedures (by a different surgeon) for "right shoulder deep prosthetic infection followed by closure over an antibiotic humeral cement prosthesis."

Plaintiff filed suit for medical malpractice on July 14, 2014, alleging that defendant had breached the standard of care "by failing to diagnose Plaintiff's postoperative infectious process in a timely manner and by failing to timely treat that condition using the various medical and surgical options that were available to him." Plaintiff further alleged that defendant had "failed to timely prescribe IV antibiotics to address that infectious process medically; and eventually he failed to remove the prosthesis in a timely manner." Plaintiff also alleged that defendant had misinterpreted lab results analyzing fluids aspirated from his wound, and had "failed to effectively diagnose and treat the infectious process for almost three months, which permitted the infection to fully involve the joint structures including is [sic] bony components necessitating the removal of the prosthesis and necessitating numerous remedial surgeries."

Plaintiff attached to his complaint an affidavit of merit from Dr. Michael Rubinstein. Dr. Rubinstein's affidavit stated that "[t]he standards of care for an orthopaedic surgeon required that the physician be vigilant regarding any signs or symptoms of a postoperative infection following a hemiarthroplasty procedure. At the first sign of possible infection, the physician must aggressively rule out an infection in a timely manner." Dr. Rubinstein's affidavit opined that defendant had breached this standard of care by failing to diagnose and treat a "postoperative infections process," failing to timely prescribe IV antibiotics, and failing to remove the prosthesis in a timely manner, which "permitted the infection to fully involve the shoulder joint structures" and necessitated numerous remedial surgeries. Dr. Rubinstein's affidavit also stated

_____

[7] A purulent discharge is a discharge containing or consisting of pus. See https://www.merriam-webster.com/dictionary/purulent (last visited July 23, 2018).

that defendant had breached the standard of care by misinterpreting the results of the laboratory analysis of fluid aspirated from plaintiff's shoulder and by failing to account for the fact that plaintiff had already been given antibiotics at the time the fluid was aspirated. Additionally, Dr. Rubinstein's affidavit stated that defendant should have consulted with an infectious disease specialist at the time of plaintiff's July 20, 2012 visit, should have begun IV antibiotic therapy for a period long enough to reasonably treat the infection, and should have considered removing the prosthesis earlier.

At his deposition, plaintiff testified that he had a history of right shoulder problems over the past 40 years, including pain that had developed and worsened over the years. Plaintiff testified to discussing issues related to swelling, warmth, and leakage in the area with defendant on various dates as described above. Plaintiff stated that he could not recall specifics of what he discussed with defendant on any particular date. Plaintiff did not testify to having suffered from continuing pain in his shoulder after the initial surgery.

At his deposition, Dr. Rubinstein testified that upon further review of defendant's and plaintiff's depositions and some additional medical notes, he had altered his opinion regarding defendant's alleged breach of the standard of care, stating:

> Given the fact of – of what Dr. Shapiro discusses in his deposition, he feels as though he was doing everything in his power, medical knowledge, to try and eradicate the condition. I mean, I think that anybody who has an infection or has problems with total shoulders, any total shoulder surgeon understands that infection is a disaster.
>
> And so after reviewing the depositions and all, and looking at Dr. Shapiro's deposition take on all this, I believe that the standard of care was not breached in this – in this case. Of course, then you look at plaintiff's side, and there's some differences there.

The following exchange then occurred:

> *Q.* And looking at it from Dr. Shapiro's medical records, the hospital records, Dr. Shapiro's deposition transcripts, from that perspective, setting aside Mr. Williams testimony, you don't believe there's a breach of the standard of care in this case, do you?
>
> *A.* Looking at all that, that's correct.
>
> *Q.* Okay. And so you would withdraw standard of care opinions just looking at that, ignoring the plaintiff's deposition testimony?
>
> *A.* That's correct.

When asked to clarify his position on whether defendant had breached the standard of care, Dr. Rubinstein said that pain within the first week after total shoulder arthroplasty is reasonably thought of as post-operative pain, but that infections start after 7 to 10 days. Therefore, if pain continued after the hematoma was drained, and the wound opens, a shoulder

arthroplasty surgeon should be alerted that there is most likely an infection.[8] Dr. Rubinstein agreed that all of the steps that defendant had taken in response to plaintiff's symptoms were reasonable, unless plaintiff had continued to complain of pain. The following exchange then occurred between Dr. Rubinstein and defendant's attorney:

> *Q.* Okay. Now, to go back to the one standard of care criticism you had, is that your only standard of care criticism, that if Mr. Williams' testimony is correct and he had continuing pain and drainage, and that was being ignored or not treated by Dr. Shapiro, that that would be a breach of the standard of care?

> *A.* Correct, because – because looking at what he's saying is that if an individual is to continue to say, "I am having pain," anyone who is a joint surgeon would look and see that that's usually some indication of an infection. According to what he's saying is what he's telling in his deposition, then that would be an issue in regards to diligent treatment and timely diagnosis of an infection.

Dr. Rubinstein opined at his deposition that if the infection had been detected earlier and was successfully treated, the shoulder prosthesis might not have had to be removed; however, it was possible that even earlier detection would have required the removal of the prosthesis.

Following discovery, defendant moved for summary disposition under MCR 2.116(C)(10), arguing that Dr. Rubinstein had withdrawn all of his opinions related to defendant's alleged breach of the standard of care except for one—that defendant would have breached the standard of care if plaintiff had made continuing complaints of right shoulder pain to defendant and if defendant had ignored them. Defendant argued that the documentary evidence submitted to the trial court showed that plaintiff had not made continuing complaints of pain to defendant, and that defendant had not ignored any complaints made by plaintiff. Defendant also argued that plaintiff could not establish causation, because Dr. Rubinstein had testified at his deposition that he could not state with any reasonable degree of probability that earlier antibiotic treatment would have saved plaintiff's shoulder installation.

Following oral argument, the trial court took the matter under advisement. It subsequently issued a written opinion and order denying defendant's motion, stating, with no further elaboration:

> Plaintiff has produced sufficient evidence to support the expert's testimony and establish that there are genuine issues of material fact regarding causation and the breach of the standard of care by Defendant Shapiro.

This appeal followed.

---

[8] Dr. Rubinstein appears to have formed the impression that plaintiff had referred to such pain in his deposition testimony. As discussed later in this opinion, our review of that testimony does not reveal any such reference; nor does plaintiff draw our attention to any specific statements made during his deposition.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a summary disposition motion to determine whether the moving party is entitled to judgment as a matter of law. *Cuddington v United Health Servs, Inc,* 298 Mich App 264, 270; 826 NW2d 519 (2012). When deciding a motion for summary disposition brought under MCR 2.116(C)(10), a court must consider the pleadings, affidavits, depositions, admissions and other documentary evidence submitted in the light most favorable to the nonmoving party. MCR 2.116(G)(5); *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012), reh den 815 NW2d 491 (2012). A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ. *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013).

## III. ANALYSIS

Defendant argues that the trial court erred by holding that plaintiff had demonstrated that there were genuine issues of material fact concerning defendant's breach of the applicable standard of care. We agree.

> Proof of a medical malpractice claim requires the demonstration of the following four factors: (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. [See *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994).]

"Expert testimony is required to establish the applicable standard of care and to demonstrate that the defendant breached that standard." *Gonzalez v St. John Hosp & Med Center*, 275 Mich App 290, 294; 739 NW2d 392 (2007).

Here, Dr. Rubinstein's affidavit established the applicable standard of care for an orthopaedic surgeon dealing with possible post-operative infection, and stated that defendant had violated that standard of care in several respects. However, Dr. Rubinstein later retracted the majority of his criticisms of defendant's conduct after further review of the record, ultimately stating only that the standard of care required a surgeon to diligently investigate continuing complaints of post-surgical shoulder pain, and that defendant would have breached that standard if plaintiff had made, and defendant had ignored, such continuing complaints made more than 7 to 10 days after the surgery. Dr. Rubinstein further admitted that his review of the medical records in this case did not reveal plaintiff making such complaints.

As a threshold issue, defendant argues that this Court should find Dr. Rubinstein's other statements concerning the applicable standard of care and defendant's possible breach of that standard to be inadmissible under MRE 702. We find that argument unpersuasive. It is true that an expert's testimony must be "based on sufficient facts or data", MRE 702, which "shall be in evidence," MRE 703, in order to be admissible, and that evidence in support of a party's response to a summary disposition motion under MCR 2.116(C)(10) must be "substantively admissible," *Maiden v Rozwood*, 461 Mich 109, 123; 597 NW2d 817 (1999). But defendant never moved to strike Dr. Rubinstein's testimony below; nor did the trial court premise its ruling

on the admissibility of Dr. Rubinstein's testimony. This Court generally does not consider issues not raised before or decided by the trial court. See *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993). Moreover, we see no need to decide the issue on this ground in light of our conclusion that Dr. Rubinstein's testimony and the record at summary disposition fails to establish that defendant breached the applicable standard of care. *Gonzalez*, 275 Mich App at 294.

Taking Dr. Rubinstein's expert opinion (and the other evidence provided to the trial court) in the light most favorable to plaintiff, plaintiff has failed to demonstrate that there are genuine issues of material fact concerning whether defendant breached the applicable standard of care by ignoring plaintiff's complaints of post-surgical pain. As Dr. Rubinstein noted, the medical records in this case are devoid of references to ongoing pain, particularly after the 7- to 10-day post-surgical period during which Dr. Rubinstein stated a patient would commonly experience pain from recent surgery. The records of plaintiff's visit to defendant on July 19 and his emergency room visit the following day do contain references to pain; however, those visits occurred only three and four days after the surgery. After that, although there are references to swelling and drainage issues, the record is devoid of complaints of continuing pain. Although plaintiff points out that he received prescriptions for pain medication during the relevant time period, there is no indication that plaintiff actually reported continuing pain to defendant. The text messages between plaintiff and defendant provided to the trial court show frequent communication, but very few references to pain—for example, plaintiff referred to having pain on September 25, 2012, the day he was admitted to hospital and the day before the surgery to remove his shoulder prosthesis, and there are some isolated references to pain medication.

Further, the record does not show that defendant ignored any complaint from plaintiff. Although plaintiff argues that defendant failed to order IV antibiotics in a timely fashion, the record shows that defendant was given IV antibiotics just days after his initial surgery. Moreover, Dr. Rubinstein testified that defendant "was doing what he could to eradicate what seemed to be a problem" for plaintiff. Although plaintiff argues that defendant's actions in prescribing antibiotics indicate that defendant was aware that plaintiff was suffering an infection, plaintiff's expert testified that specific actions taken by defendant, including prescribing oral antibiotics, taking samples for laboratory analysis, draining the area when a post-surgical hematoma developed, etc., were all reasonable steps for a surgeon to take in treating plaintiff's symptoms, if they occurred in the absence of continuing complaints of post-surgical pain. And the record is devoid of evidence of such complaints; in fact, plaintiff himself never testified in his deposition that he suffered from continuing pain post-surgery or that he had informed defendant of any such pain.

Plaintiff is correct that a trial court is not permitted to weigh evidence or resolve credibility disputes. See *Wurtz v Beecher Metro Dist*, 298 Mich App 75, 90; 825 NW2d 651 (2012). However, there is no such dispute here. Even assuming that Dr. Rubinstein's testimony is fully admissible, and construing it and the other documentary evidence in the light most favorable to plaintiff, plaintiff has failed to demonstrate that there are genuine issues of material fact concerning defendant's alleged breach of the applicable standard of care. *Gonzalez*, 275 Mich App at 294. Although Dr. Rubinstein, during his deposition, appeared to have formed the impression that plaintiff had made references to continued post-surgery pain at his deposition, our review of that testimony reveals no such references. Nor does plaintiff's deposition

testimony indicate that plaintiff ever informed defendant of post-surgical pain even if it did exist; in fact, plaintiff testified that he could not remember what was discussed with defendant on any particular day, and testified generally to discussing swelling, warmth, and leakage in the right shoulder area with defendant, but not pain. Plaintiff has therefore failed to establish an element of his medical malpractice claim, see *Locke*, 446 Mich at 222, and the trial court accordingly erred by denying defendant's motion for summary disposition under MCR 2.116(C)(10), *Cuddington*, 298 Mich App at 270.[9]

Reversed and remanded for entry of an order granting summary disposition in favor of defendants. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Mark T. Boonstra

---

[9] Because we conclude that plaintiff failed to establish the element of defendant's breach of the applicable standard of care, we do not address defendant's arguments concerning proximate cause.